UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LAWRENCE C. DENARD,

          Petitioner,

    v.

J. ROBERTSON,

          Respondent.

Case No. 19-cv-05474-WHA (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY**

## INTRODUCTION

Petitioner filed this pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He claims that his conviction and sentence violate the federal constitution. Respondent was ordered to show cause why the petition should not be granted based upon petitioner's six cognizable claims for relief. Respondent filed an answer with a supporting memorandum and exhibits, and petitioner filed a traverse. For the reasons discussed below, the petition is **DENIED.**

## STATEMENT

**A.     PROCEDURAL BACKGROUND**

Petitioner was convicted in Alameda County Superior Court in 2014 of first-degree murder, attempted murder, shooting from a motor vehicle, and possession of a firearm by a felon (ECF No. 16 at 252–67).[1] The trial court sentenced petitioner to a term of 137 years to life in state prison (*ibid.*; ECF No. 16-1 at 10). Petitioner appealed. On October 30, 2017, the California Court of Appeal affirmed his judgment and denied his habeas petition, which had been consolidated with his appeal (ECF No. 18-4). On February 14, 2018, the California Supreme Court granted the petition for review and transferred the matter back to the court of appeal with directions to vacate its decision and reconsider the case in light of Senate Bill No. 620, which amended the California Penal Code to permit trial courts to strike certain firearm enhancements in

---

[1] Petitioner was tried and convicted with his codefendant, Willie Torrence. Their state court appeals were considered together.

United States District Court
Northern District of California

the interest of justice (ECF No. 18-6).  On March 19, 2018, the California Court of Appeal ordered a limited remand to the trial court, which declined to strike any of petitioner's firearm enhancements and reaffirmed the original sentence (ECF No. 18-9).  The California Court of Appeal reaffirmed its judgment in all other respects and summarily denied petitioner's habeas petition (ECF No. 18-4).  The California Supreme Court denied review on June 27, 2018 (ECF No. 18-11).  Thereafter, Petitioner filed the instant habeas petition.[2]

## B.    FACTUAL BACKGROUND

The following description of the evidence presented at trial has been taken from the opinion of the California Court of Appeal (ECF No. 18-4 at 3–8).  The California Court of Appeal's summary of the facts of petitioner's offense is presumed correct.  *See Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

The case involves the murder of a three-year old boy, and attempted murder of Jerome Williams and Robert Hudson.  On August 8, 2011, a gray Dodge Neon was seen driving near 64th Avenue in Oakland.  A witness saw a dreadlocked, dark-skinned African American male reach an arm with a gun out of the passenger window of the vehicle.  The witness then heard approximately ten gunshots.  She got out of her vehicle and saw Williams and Hudson on the ground with gunshot wounds.  The witness attempted to aid the child, but he died before an ambulance arrived.

Williams testified that he was arrested for failure to appear as a witness in the case and was compelled to testify.  Williams described his fear of testifying in front of people from the 69th Avenue Village.  He detailed the ongoing feud between the 65th Avenue Village and the 69th Avenue Village housing projects.  He testified that midday on August 8, 2011, he and Hudson were standing on International Boulevard between 64th and 65th Avenues.  He observed a gray car pass and recognized the driver as Willie Torrence, also known as "Whoa" or "Little Will."  The car made a U-turn and Williams heard gunshots.  Williams was shot in the head and shoulder and fell to the ground.  At the hospital, Williams identified Torrence as the driver and identified his photograph from a photo lineup.  He also identified a photograph of the car Torrence was

---

[2] Petitioner filed a motion to stay his habeas petition, which was denied (ECF No. 9).  Petitioner later sought to withdraw his motion to stay and resubmitted an identical habeas petition (ECF No. 11).

driving.  Williams did not see the shooter.

Hudson, the other adult victim in this case, testified that he was in custody because of his failure to appear as a witness.  He testified that on the day of the shooting, Hudson was with Williams on International Boulevard.  Hudson saw Williams get a scared look and when he turned around, he observed a gun and hid behind a car.  He heard five gunshots.

Oakland Police Sergeant Steven Nowak testified that he spoke to Hudson at the hospital. At the time, Hudson was in critical condition, with a tube in his mouth.  When asked if Hudson could identify the individuals involved in the shooting, he nodded yes.  Hudson was shown photographs, and when asked if he recognized one of the shooters, he nodded yes.  The sergeant pointed to the first photo and Hudson shook his head no.  The sergeant pointed to the second photo, and Hudson nodded his head yes.  When the sergeant pointed to the third photo, Hudson shook his head no.  The sergeant returned to the second photo, and again Hudson nodded his head yes.  The sergeant asked if Hudson was identifying the shooter, and Hudson nodded yes.

At trial, Hudson testified that he identified petitioner in the photo lineup because he had seen petitioner on the news.  He acknowledged that his initials were on petitioner's photograph but testified that he did not put them there.  Hudson was also shown a videotaped interview conducted at the district attorney's office.  In that video, Hudson identified petitioner as the shooter, stating, that he saw Laylow in the window of the car with a gun and described Laylow as dark-skinned with dreadlocks.  At trial, Hudson testified that the tape had been doctored.

DeShawn Rico helped Hudson after he was shot.  On the night of the shooting, DeShawn was arrested for possession of a firearm and gave a statement to the police.  He later gave a videotaped interview.  He twice identified petitioner as the shooter.  At trial, DeShawn disavowed his earlier statements.  DeShawn did not want to testify at trial — he was compelled to testify pursuant to a warrant.

Torrence's girlfriend, Desiree, testified that she owned a Dodge Neon.  She stated that around 9:00 a.m. on August 8, Torrence dropped her at work and left in her Neon.  That afternoon, around 2:30 p.m., Torrence called and said he was on his way to return the car.  Video surveillance from two local businesses showed the vehicle heading West on International Boulevard, then

United States District Court
Northern District of California

United States District Court
Northern District of California

making a U-turn, and coming back Eastbound on International Boulevard.

Petitioner was arrested at his home on August 9, 2011, and Torrence was arrested three days later.  Their cell phones were seized.  An expert on cell phone tower data testified that the defendants' cell phone data placed them in the vicinity of International Boulevard around the time of the shooting.  He also opined that the two phones were in close proximity to each other during that time.

Five videos taken from petitioner's cell phone were played for the jury.  In the videos, petitioner claimed an association with 69th Avenue Village.  He also displayed handguns, talked of drug dealing and shooting rival gang members, and showed scenes of drugs.  Letters to and from the defendants while they were in jail were admitted into evidence.  The letters mentioned Williams and Hudson as the witnesses who identified petitioner and his co-defendant and threatened them with retaliation.

Oakland Police Lieutenant Tony Jones testified as an expert on Oakland gangs.  He described the ongoing feud between the 65th and 69th Village gangs.  He testified that the shooting took place in 65th Village's turf and explained that the primary activities of the 69th Village gang include murder, drug dealing, robbery, and possession of guns.  Photographs of the defendants' tattoos were introduced, including petitioner's tattoos which include the numbers "6" and "9."  Images recovered from social media showed Torrence and petitioner displaying hand signals associated with the 69th Village gang.  Jones explained that based on the tattoos, social media accounts and statements to the police, petitioner and Torrence were members of the 69th Village gang.  He explained that Williams, Hudson, and DeShawn were members of the 65th Village gang.

## ANALYSIS

A.  **STANDARD OF REVIEW**

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petition may

not be granted with respect to any claim adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id*. at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."  *Id.* at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  *Id*. at 409.

The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991).[3]  In reviewing each claim, the court must examine the last reasoned state court decision that addressed the claim.  *Cannedy v. Adams*, 706 F.3d 1148, 1158 (9th Cir.), *amended*, 733 F.3d 794 (9th Cir. 2013).

**B.     CLAIMS FOR RELIEF**

As grounds for federal habeas relief, petitioner claims: (1) a *Batson* violation arising out of the prosecutor's use of two peremptory challenges; (2) prosecutorial misconduct based on the prosecutor's failure to turn over favorable evidence to the defense; (3) trial court error in allowing

---

[3] Although *Ylst* was a procedural default case, the "look through" rule announced there has been extended beyond the context of procedural default.  *Barker v. Fleming*, 423 F.3d 1085, 1091 n.3 (9th Cir. 2005).

United States District Court
Northern District of California

the testimony of Lieutenant Tony Jones in violation of the Confrontation Clause; (4) denial of petitioner's right to a public trial; (5) multiple instances of ineffective assistance of counsel; and (6) cumulative error.

### 1.   BATSON CHALLENGE: CLAIM ONE

Petitioner avers that the prosecutor's peremptory challenges of prospective jurors S.K. and L.A., on the basis of their race and gender, violated his rights under the Equal Protection Clause.[4] (Pet. at 5–19).  He contends that the trial court erred in evaluating the prosecutor's explanations for disqualifying the jurors (*id)*.

In total, 66 prospective jurors were questioned in this case — 39 women and 27 men (ECF No. 18-14 at 262–82).  The final jury was comprised of six women, three of whom were African American, and six men, none of whom where African America (*id*. at 277).  The prosecutor exercised 27 peremptory challenges against 14 males and 13 females (*id*. at 279.)  He excused 9 white males, 7 white females, 3 African American males, 3 African American females, 1 Filipino male and three Asian females (*id*. at 277–79).

The California Court of Appeal first laid out the three-step process that courts must follow in analyzing a *Batson* challenge:

> First, the *Batson/Wheeler* movant must demonstrate a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose. . . .  Second, if the court finds the movant meets the threshold for demonstrating a prima facie case, the burden shifts to the opponent of the motion to give an adequate nondiscriminatory explanation for the challenges.  To meet the second step's requirement, the opponent of the motion must provide 'a "clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges.'  [Citation.]  In evaluating a trial court's finding that a party has offered a neutral basis—one not based on race, ethnicity, or similar grounds—for subjecting particular prospective jurors to peremptory challenge, we are mindful that ' "[u]nless a discriminatory intent is inherent in the prosecutor's explanation," ' the reason will be deemed neutral.  [Citation.] [¶]  Third, if the opponent indeed tenders a neutral explanation, the trial court must decide whether the movant has proven purposeful discrimination. [Citation.]  In order to prevail, the movant must show it was ' "more likely than not that the challenge was improperly motivated." '

United States District Court
Northern District of California

---

[4] In his state court appeal, petitioner alleged that nine jurors were improperly excused (ECF No. 18-4 at 10–11).  Petitioner only raises two of those challenges in the instant petition.

1   (ECF No. 18-4 at 9–10).  The appellate court then found that the trial judge provided well-

2   reasoned analysis for finding the prosecutor's explanations sincere (*id*. at 11).

3           The Supreme Court has held that the Equal Protection Clause forbids the challenging of

4   potential jurors solely on account of their race, *Batson v. Kentucky*, 476 U.S. 79, 89 (1986), or on

5   their gender, *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 130–43 (1994).  A *Batson* challenge to

6   a peremptory strike requires a three-step inquiry.  *First*, the defendant must make out a *prima facie*

7   case that the prosecutor exercised peremptory challenges on the basis of race (or gender) "by

8   showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose."

9   *Batson*, 476 U.S. at 93–94.  *Second*, if the requisite showing has been made, the burden shifts to

10  the prosecutor to articulate a race-neutral (or gender-neutral) explanation for striking the jurors in

11  question.  *Id.* at 97.  Finally, the trial court must determine whether the defendant has carried his

12  burden of proving purposeful discrimination.  *Id.* at 98.

13          "To fulfill its duty, the court must evaluate the prosecutor's proffered reasons and

14  credibility under the totality of the relevant facts, using all the available tools including its own

15  observations and the assistance of counsel."  *Mitleider v. Hall*, 391 F.3d 1039, 1047 (9th Cir.

16  2004).  "As part of its evaluation of the prosecutor's reasoning, the court must conduct a

17  comparative juror analysis—that is, it must 'compare African American panelists who were struck

18  with those non-African American panelists who were allowed to serve.'"  *Jamerson v. Runnels*,

19  713 F.3d 1218, 1224 (9th Cir. 2013) (citation omitted).  "The prosecution's treatment of minority

20  jurors as compared to its treatment of nonminority jurors is among the facts indicative of the

21  presence of a purpose to discriminate."  *McDaniels v. Kirkland*, 813 F.3d 770, 778 (9th Cir. 2015)

22  (citing *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005)).  Ultimately, the defendant has the burden

23  of persuading the court that the strike was racially motivated.  *Rice v. Collins*, 546 U.S. 333, 338

24  (2006) (citing *Purkett v. Elem*, 514 U.S. 765, 768 (1995)).

25          The role of a federal court on habeas review is to "guard against extreme malfunctions in

26  the state criminal justice systems, not to apply *de novo* review of factual findings and to substitute

27  its own opinions for the determination made on the scene by the trial judge."  *Davis v. Ayala*, 576

28  U.S. 257, 276 (2015) (internal citation omitted).  Because determinations of credibility and

United States District Court
Northern District of California

demeanor of the prosecutor and jurors lie "peculiarly within [the] trial judge's province" the trial court's ruling on the issue of discriminatory intent is entitled to great deference and must be sustained unless clearly erroneous. *Snyder v. Louisiana*, 552 U.S. 472, 476–82 (2008) (citation omitted). Thus, a federal habeas court may only grant habeas relief "if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Rice*, 546 U.S. at 338.

        a.  <u>Prospective Juror S.K.</u>

During the trial court proceedings, the prosecutor explained that he struck juror S.K. because of his occupation as a social worker, his bipolar disorder, and S.K.'s negative experiences with law enforcement:

> He had an extreme focus on psychology, sociology and social work in general. . . . He was presently employed as a social worker. He brought to the attention of this Court that he was seeking further employment in another aspect of social work; child protective services. . . . This focus on social work then, is a concern in that again, it is a focus on rehabilitation, not accountability, but on rehabilitation of an individual. It is a focus on giving the benefit of the doubt on reform, not on holding accountable. This is coupled by negative experiences that he has had with law enforcement.
>
> . . .
>
> He is bipolar. And he talked to us about that and it is not a protective class, it is not dealing with his disability, it is dealing more importantly with his ability to deliberate in this jury and not be effected by his bipolar diagnosis. Of great concern, is [S.K.'s] assessment or rather honest recitation that even though doctors have prescribed mediation for him, he has refused to take it.

(ECF No. 18-14 at 296–97).

With respect to juror S.K., the California Court of Appeal found the explanations credible:

> The prosecutor explained that he excused S.K. in part because of his occupation as a social worker[.] . . .The prosecutor also observed that S.K. had reported two bad experiences with police and that he had nodded affirmatively when another male juror gave an answer during voir dire that the prosecutor thought was particularly defense-oriented. Finally, the prosecutor was concerned that S.K. would have trouble deliberating because he suffered from bipolar disorder and his "triggers" included "people yelling at me," or "out right rudeness."
>
> . . .
>
> The prosecutor's concerns with the prospective juror's mental health are a second, nondiscriminatory explanation for the challenge. Substantial evidence supports the court's finding that the prosecutor's

reasons were sincere.

Defendant's comparison of S.K. to Juror No. 12, who was not challenged by the prosecutor, is inapt.  Although Juror No. 12 had an undergraduate degree in psychology, she was a second grade teacher, not a social worker.

(ECF No. 18-4 at 13–14).

The appellate court's rejection of this claim was not unreasonable.  The stated reason for the prosecutor's challenge was S.K.'s occupation as a social worker, which has routinely been found to be a credible basis for exercising a peremptory change.  *See, e.g.*, *United States v. Maxwell*, 473 F.3d 868, 872 (9th Cir. 2007) (inference that juror's employment might make juror more sympathetic to criminal defendant is a valid, race-neutral reason for striking juror); *Hall v. Luebbers*, 341 F.3d 706, 713 (8th Cir. 2003) ("Occupation is a permissible reason to defend against a *Batson* challenge, and being a social worker could be a legitimate basis to strike a prospective juror."); *United States v. Smith*, 223 F.3d 554, 569 (7th Cir. 2000) (prosecutor's stated reason to strike a potential juror because she was "a social worker type" who would be "too sympathetic towards the defendants" was found non-racial).  A previous negative experience with law enforcement also constitutes an acceptable, race-neutral explanation for striking a potential juror.  *See Mitleider* 391 F.3d at 1048.  Finally, the prosecutor expressed concern that S.K.'s untreated bipolar disorder could be triggered during jury deliberation, were it to become confrontational.  There is nothing to indicate that any of these explanations were pretextual.

Furthermore, comparative juror analysis does not support petitioner's contention that the reasons were pretextual.  A review of the jury selection process reveals that no jurors similar to S.K. were permitted to serve on the jury.  While one female juror wrote in her questionnaire that she had an emphasis in psychology as an undergraduate, she also indicated that it involved no training, and her stated occupation was a teacher (ECF No. 19-4 at 202–03).  In contrast, S.K. indicated that he had a background in psychology, and was currently employed as a social worker (ECF No. 18-13 at 104).  And while two jurors wrote that they had negative feelings about law enforcement (ECF No. 19-4 at 99, 189), the prosecutor made clear that it was S.K.'s occupation, coupled with his bipolar disorder and negative police encounters, that caused him to strike the juror.  Overall, the reasons articulated by the prosecutor are facially valid and the state court's

United States District Court
Northern District of California

9

1   decision denying this claim was not unreasonable.

2           b.  Prospective Juror L.A.

3           The prosecutor excused L.A. because he was concerned with L.A.'s occupation as a mail

4   carrier, and L.A.'s harsh demeanor.  The California Court of Appeal explained:

> The prosecutor gave four reasons for excusing L.A.  First, he had been
> a postal worker for 23 years and the prosecutor opined that "postal
> workers are traditionally a group that prosecutors have to give a
> critical eye to, because they operate on an individual basis . . . if they
> are operating as [a] carrier.  They work alone, not with other people.
> They often then can be viewed as having difficulty in terms of
> working as a group, coming to a group resolution."  Second, the
> prosecutor thought L.A. "had a very harsh demeanor."  He was "an
> imposing individual [who] gave short curt answers both in his
> questionnaire and when he was voir dired."  Third, he was resistant to
> answering questions "about his employment" which caused the
> prosecutor concern because when a juror is "less forthcoming . . . I do
> not know what is behind that curtain then.  I am not going to press
> him about it, because I will further alienate him, but that refusal is
> certainly a concern."  Finally, he "was falling asleep" when the court
> was reading the charges and the next day he failed to show up for an
> entire morning of voir dire.
>
> . . .
>
> The trial court found the prosecutor's explanation sincere and we see
> no evidence of pretext.
>
> Contrary to defendants' argument, the lack of sincerity is not
> demonstrated by the prosecutor's failure to excuse Juror No. 7, who
> also worked as a postal carrier.  As the Attorney General notes,
> however, unlike L.A. who worked as a letter carrier for 21 years, Juror
> No. 7 "retired after having been an engineer with Chevron in
> Richmond for 36 years.  The two years he listed as having been a
> postal worker, inferably as a student, were a small fraction of his
> career."

21  (ECF No. 18-4 at 12–13).

22          Once again, the appellate court's rejection of this claim was not unreasonable.  As

23  previously noted, a prospective juror's occupation is generally a credible basis for exercising a

24  peremptory change.  *See Cook v. LaMarque*, 593 F.3d 810, 818 (9th Cir. 2010) ("a juror's

25  occupation is generally a legitimate reason for a peremptory challenge") (citation omitted).  Some

26  courts have determined that the removal of jurors because they are postal workers not to be a

27  *Batson* violation.  *See, e.g.*, *Williams v. Grouse*, 77 F.3d 259, 261 (8th Cir. 1996) (holding that

28  prosecutor's removal of two jurors because they were postal workers was race-neutral).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Beyond his occupation, the prosecutor articulated his concern with L.A.'s harsh demeanor

2  and his curt answers.  A review of the record reveals that a number of L.A.'s answers were short

3  and evasive with respect to his occupation (ECF No. 18-12 at 260–68).  The record also shows

4  that L.A. was not present for a morning of voir dire (*id.* at 260).  The trial judge found that the

5  prosecutor "was generally correct in terms of [L.A.]'s demeanor" insofar as he was curt in his

6  answers (ECF No. 18-15 at 43).  *See Snyder*, 552 U.S. at 477 ("race-neutral reasons for

7  peremptory challenges often invoke a juror's demeanor . . ., making the trial court's firsthand

8  observations of even greater importance.")  With respect to the juror falling asleep, the judge

9  noted, "[t]he observation of him falling asleep, I didn't see those so I can't state whether or not

10  that observation is correct" (ECF No. 18-15 at 43).  The trial judge did agree that L.A.'s failure to

11  show up for a full morning of voir dire without any excuse, was a race-neutral explanation for why

12  the prosecutor believed L.A. would not be an appropriate juror (ECF No. 18-15 at 44).  Thus,

13  nothing in the record shows that the prosecutor's challenge was clearly pretextual.

14    Comparative juror analysis also does not indicate that the peremptory challenge was

15  pretextual.  As the trial judge noted, "no one else on the panel is similarly situated.  No one else on

16  this panel [] missed an entire session in court.  No one else was late in this fashion" (*id.* at 43–44).

17  And while one juror indicated in his questionnaire that he worked as a postal worker for two years,

18  he subsequently worked as an engineer for 36 years (ECF No. 19-4 at 112).  In contrast, L.A.

19  served as a postal carrier for 21 years (ECF No. 18-12 at 266), and of primary concern to the

20  prosecutor was the degree to which postal workers spend time alone.  Because the record fails to

21  show that the prosecutor's reasons were pretextual, the state court's rejection of this claim was not

22  unreasonable.

23        c.  Trial Judge's Analysis of *Batson* Challenge

24    Petitioner also argues that the trial judge erred in his *Batson* analysis by: (1) failing to

25  consider the history of racial bias exhibited by the Alameda County District Attorney's Office;

26  and (2) improperly considering his own experiences in denying the *Batson* challenge (Pet. 8).

27    The California Court of Appeal found the first argument waived because petitioner's

28  attorney "expressly discouraged the court from considering 'things that are outside of our record

such as other experiences'" (ECF No. 18-4 at 12).  Regarding the second argument, the appellate court, relying on California state law, explained that a judge is permitted to rely on his or her experiences as a lawyer and bench officer (*id*. at 17).

Even assuming the first argument is not waived, petitioner fails to establish whether the judge was presented with the salient facts with respect to any history of racial bias.  Without more, petitioner cannot prevail on this claim.  Nor can petitioner prevail on his second argument. Petitioner presents no Supreme Court case that prohibits a judge from relying on his personal experiences as one factor in assessing a *Batson* challenge.  *See Mitleider*, 391 F.3d at 1047 (emphasizing that the court must evaluate the prosecutor's explanations "using all the available tools . . .").  Habeas relief is denied on this claim.

### 2.  BRADY CHALLENGE: CLAIM TWO

Petitioner avers that the prosecutor: (1) failed to disclose that DeShawn Rico, a State witness who aided Hudson after he was shot, was a suspect in a 2011 double homicide; (2) failed to provide the defense with DeShawn Rico's juvenile record; and (3) failed to disclose that the prosecution's gang expert, Lieutenant Tony Jones, sent racist text messages to his fellow officer, Sergeant Mike Gant (Pet. 20–24).

Under *Brady v. Maryland*, 373 U.S. 83 (1963), the state bears an "affirmative duty to disclose [material] evidence favorable to a defendant."  *Kyles v. Whitley*, 514 U.S. 419, 432 (1995) (citing *Brady*, 373 U.S. 83).  "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *United States v. Bagley*, 473 U.S. 667, 682 (1985).  "A reasonable probability does not mean that the defendant would more likely than not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to undermine[ ] confidence in the outcome of the trial."  *Smith v. Cain*, 565 U.S. 73, 74 (2012) (citation and quotation marks omitted).  In *Strickler v. Greene*, the Supreme Court clarified that "[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." 527 U.S. 263, 281–82 (1999).

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

      a.  <u>Failure to Disclose that DeShawn Rico was a Suspect in a Murder</u>

      Petitioner claims that the state violated its obligation under *Brady* by failing to disclose that at the time DeShawn testified for the prosecution, he was a known suspect in a murder. Petitioner appears to argue that this evidence could have been used to impeach DeShawn's testimony, specifically as it relates to his identification of petitioner as the shooter.

      As noted earlier, Deshawn Rico was arrested on the night of the shooting for possession of a firearm.  DeShawn offered to provide information to the police about the shooting in exchange for being released (ECF No. 17-18 at 98–99).  On cross-examination, DeShawn was impeached with this information by the defense (ECF No. 17-14 at 46–47.)

      The California Court of Appeal explained that two months prior to trial, a confidential informant notified the Oakland Police Department that DeShawn may have been involved in a 2011 murder (ECF No. 18-4 at 40).  The court laid out the relevant standard under *Brady* and found it improbable that the jury verdict would have been impacted had this additional information been revealed to the jury (*id.* at 39–41).  The state appellate court explained that the jury was already aware that DeShawn was currying favor with the police.  The jury was also aware of DeShawn's association with 65th Village.  Thus, his motives to lie were presented to the jury, such that "the suggestion that he may have had an additional reason to lie because he knew he had previously participated in a murder for which he had not yet been charged is entirely speculative" (*id.* at 41).

      The state appellate court's rejection of this claim was neither contrary to nor an unreasonable application of *Brady*.  Even assuming DeShawn could have been questioned about his alleged participation in the 2011 murder, petitioner fails to show a reasonable probability that had the cited evidence been turned over, the result of the proceeding would have been different. *See Bagley*, 473 U.S. at 682.  As appropriately articulated by the state appellate court, DeShawn's motives to lie in identifying petitioner were already well documented for the jury.  DeShawn was arrested on a firearms possession just prior to making his identification and offered to provide information about the shooting in exchange for being released.  DeShawn was also part of a rival gang.  Any evidence that DeShawn was an uncharged suspect in a prior murder, would have been

unreliable, cumulative for impeachment purposes, and insufficient to alter the jury verdict.  *See United States v. Sarno*, 73 F.3d 1470, 1506–07 (9th Cir. 1995) (holding evidence that is "marginal, ambiguous, cumulative, inadmissible, unreliable, inculpatory, irrelevant, or of negligible probative worth[ ] falls far short of" materiality).  Habeas relief is denied on this claim.

b.  <u>Failure to Disclose DeShawn's Juvenile Record</u>

Petitioner contends that the prosecution failed to disclose evidence of DeShawn's juvenile record, which could have been used to impeach his testimony.  He explains that the prosecution informed the defense that DeShawn had no record as an adult or juvenile for crimes of moral turpitude, and that all relevant criminal history would be revealed at trial (Pet. 20).

Prior to trial, the prosecution notified the defense that DeShawn had "no known adult convictions for felony or misdemeanor crimes of moral turpitude" and that he had "only one arrest for a crime involving moral turpitude" (ECF No. 19-3 at 100).  According to the California Court of Appeal, DeShawn's juvenile record shows that a petition was filed alleging he committed numerous felonies (ECF No. 18-4 at 39, FN. 10).  The petition was later sustained based on DeShawn's admission to evading arrest and the remaining allegations were dismissed (*ibid*).  In addressing petitioner's argument on appeal, the appellate court found no violation under *Brady* because information relating to DeShawn's juvenile record was available: "[a]lthough DeShawn's juvenile record was not disclosed, the police report of DeShawn's arrest, which was disclosed, indicates that DeShawn had a sustained juvenile petition in November 2010 for resisting arrest" (*id*. at 40).

The state court did not unreasonably apply *Brady*.  In clarifying the scope of the suppression prong under *Brady*, the Ninth Circuit has explained that if the defendant "possessed the salient facts regarding the existence of the records he claims were withheld such that defense counsel could have sought the documents through discovery, there [i]s no suppression under *Brady*."  *Cunningham v. Wong*, 704 F.3d 1143, 1154 (9th Cir. 2013) (citation and quotation marks omitted).  Here, it is undisputed that petitioner possessed the salient facts surrounding DeShawn's juvenile record, as that information was contained within documents provided to the defense.

Even assuming, however, that the juvenile record was suppressed because the defense was

14

misled by the prosecutor's assurances, petitioner still fails to show that the records were material. As already expressed, DeShawn's arrest for a firearm possession and his gang membership were presented to the jury.  The fact that he had a sustained juvenile petition for resisting arrest was unlikely to sway a single juror.  Furthermore, there was considerable evidence implicating petitioner in the shootings — Hudson's identification of petitioner prior to trial and the cell phone analysis.  In addition, just prior to the shooting, petitioner recorded videos in which he described his desire to commit a violent act against rival gang members (*see* ECF No. 17-17 at 97–99 (in which Lieutenant Jones explained relevant terms in petitioner's videos)).  Thus, the state court was not unreasonable in denying petitioner's *Brady* claim.

### c. Failure to Disclose Racist Text Message

Next, petitioner contends that the state committed a *Brady* violation when it failed to disclose racist text messages sent by Lieutenant Jones, the state's gang expert, to fellow officer Michael Gant (Pet. 23).

In 2016, two years after trial, various news articles were released indicating that Lieutenant Jones exchanged racist text messages with a fellow officer (ECF No. 19-3 at 247–54).  Petitioner's appellate counsel requested information from the Alameda County District Attorney's Office related to the alleged text messages (*id*. at 83–84).  The District Attorney's Office responded, "[t]he Alameda County District Attorney's Office does not have any discovery to disclose in response to this request" (*id*. at 91).

The California Court of Appeal rejected petitioner's claim, explaining that the prosecutor cannot be faulted for failing to provide the information, because the alleged text messages only existed after the jury rendered its verdict: "[t]he texts . . . appear to have been sent in July 2014. The jury had rendered its verdict in this case in June 2014" (ECF No. 18-4 at 42).  The appellate court also stated that Officer Gant only complained about the offending text messages in August 2014, two weeks after petitioner had been sentenced (*ibid*).

The state court's rejection of this claim was neither an unreasonable application of *Brady*, nor an unreasonable determination of the facts.  At the time of trial, the alleged offending text messages did not yet exist.  Petitioner identifies no Supreme Court precedent requiring the

prosecution to disclose evidence developed only after trial.  Petitioner relies on news articles from 2016, which state that the racist text messages "go back two years" (ECF No. 19-3 at 253).  The statement in the article is unsubstantiated, and insufficient to overcome the factual findings of the state appellate court with respect to the date of the text messages.  *See* 28 U.S.C. § 2254(e)(1) ("[i]n a proceeding instituted by an application for a writ of habeas corpus . . . a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.")  Regarding any alleged *Brady* violation after trial, the Supreme Court has clarified that "*Brady* announced a constitutional requirement addressed first and foremost to the prosecution's conduct pretrial." *Skinner v. Switzer*, 562 U.S. 521, 536 (2011).  Accordingly, the state court's conclusion that the prosecution had no *Brady* obligation to share the racist text messages was not an unreasonable application of Supreme Court precedent.  Habeas relief is denied on claim two.

### 3.  CONFRONTATION CLAUSE: CLAIM THREE

Petitioner argues that his rights under the Sixth Amendment's Confrontation Clause were violated by the testimony of Lieutenant Jones and DeShawn Rico (Pet. 25–28).  He explains that Lieutenant Jones's testimony was based on inadmissible hearsay (*ibid*).  He also states that he was prevented from cross-examining DeShawn, because the witness refused to answer nearly every question asked by the defense (*id*. at 28).

#### a.  Lieutenant Jones's Testimony

Petitioner received an extended sentence under a California state statute that provides for enhancements for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."  Cal. Penal Code § 186.22(b). Petitioner argues that portions of Lieutenant Jones's testimony relied on inadmissible hearsay in connection with that charge and therefore violated his rights under the Confrontation Clause (Pet. 25–28).

At trial, the state presented Lieutenant Jones as an expert in Oakland gangs.  Most of Jones's testimony related to general information about the 65th and 69th Village gangs.  However,

1   Jones also testified about petitioner's prior arrests, as well as petitioner's connection to 69th

2   Village, relying on facts gathered from various police reports, of which he did not have direct

3   knowledge.  Petitioner takes issue with this testimony.

4          At trial, Lieutenant Jones recounted details of a 2004-armed robbery committed by

5   petitioner, his co-defendant and various other gang members (ECF No. 17-17 at 59).  According to

6   Jones, the sort of violence committed during the robbery was for the benefit of the 69th Village

7   gang (*id*. at 61).  Jones also recounted petitioner's 2004 arrest for felony possession of a firearm

8   (*id*. at 67), opining that the details of the incident demonstrate petitioner's membership in the 69th

9   Village gang (*id*. at 69).  Jones then testified that in 2009 petitioner was arrested for felony

10  possession of a firearm (*id*. at 79).  Jones later testified about petitioner's gang moniker, relying on

11  various police documents (*id*. at 77), as well as his understanding of gang insignia represented in

12  various photographs of petitioner (*id*. at 93–94).

13         The California Court of Appeal recognized that some of Lieutenant Jones's testimony was

14  improper, but found the admission harmless, in light of the other evidence proving petitioner's

15  membership in 69th Village, and that the shooting was for the benefit of the gang:

16         Here, Jones's background information on the 69th Village and 65th
            Village gangs, including turf and history, was confirmed by the
17         victims' testimony.  The victims' membership in the 65th Village
            gang is established by William's tattoos and by the fact that the
18         victims were selling drugs in 65th Village turf, which Jones
            permissibly opined would not be allowed if they were not associated
19         with that gang.  Denard's tattoos and the videos on his phone
            overwhelmingly establish that he was an active member of the 69th
20         Village gang and that the shooting was committed in association with
            the gang for the purpose of retaliation against or intimidation of the
21         65th Village gang.  Likewise, Torrence's tattoos, the photograph of
            him in a T-shirt promising revenge for the death of a 69th Village
22         gang member, his social media posts and his writings in prison all
            establish his active participation in the 69th Village gang and that the
23         crime was committed with the requisite intent.  There is no likelihood
            that defendants would not have been convicted had the testimonial
24         hearsay been excluded.

25  (ECF No. 18-4 at 28–29).

26         The state court's decision does not rest on an unreasonable application of Supreme Court

27  law, nor an unreasonable determination of the facts.  The Confrontation Clause of the Sixth

28  Amendment provides that in criminal cases the accused has the right to "be confronted with

17

witnesses against him."  The Confrontation Clause applies to all "testimonial" statements. *Crawford v. Washington*, 541 U.S. 36, 50–52 (2004).  Statements are testimonial, "when they result from questioning, the primary purpose of [which was] to establish or prove past events potentially relevant to later criminal prosecution" and (2) "when written statements are functionally identical to live, in-court testimony, made for the purpose of establishing or proving some fact' at trial." *Lucero v. Holland*, 902 F.3d 979, 989 (9th Cir. 2018) (alteration in original) (internal quotation marks and citations omitted).

For purposes of federal habeas review, the standard applicable to violations of the Confrontation Clause is whether the inadmissible evidence had an actual and prejudicial effect upon the jury. *See Hernandez v. Small*, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).  "Whether a violation of the [C]onfrontation [C]lause is harmless depends on a variety of factors including: (1) the importance of the evidence to the prosecution's case; (2) whether the evidence was cumulative; (3) the presence of corroborating evidence; (4) the overall strength of the prosecution's case." *United States v. Shayota*, 934 F.3d 1049, 1052 (9th Cir. 2019) (citation omitted).

As the state court appropriately noted, the portions of Lieutenant Jones's testimonial hearsay were only some of the evidence connecting petitioner to the 69th Village gang.  Setting that testimony aside, there was still substantial evidence showing that petitioner was a member of 69th Village and that the shooting was committed for the benefit of the gang.  The jury was shown pictures of petitioner's tattoos and hand signals, which showed his affiliation with 69th Village (ECF No. 17-17 at 55–56, 87).  The videos on petitioner's phone repeatedly referenced his connection to 69th Village and his desire to punish rival gang members (*id.* at 97–99; ECF No. 16-4 at 174–81).  Williams testified about the ongoing feud between the two gangs, (ECF No. 17-7 at 42) and affirmed that he had a tattoo with the number 65 (*id.* at 44).  Hudson testified that he heard many people had been shot because of the ongoing feud between the two gangs (*id.* at 119–22).  Taken as a whole, the evidence reasonably supported finding that petitioner was a member of the 69th Village gang and took part in the shooting for the benefit of the gang.  Petitioner fails to show that the state court's decision denying this claim was an unreasonable application of Supreme

Court precedent or an unreasonable determination of facts.  This order denies habeas relief on this claim.

### b.   DeShawn Rico's Failure to Provide Substantive Answers

At trial, DeShawn, a State witness who aided Hudson after he was shot, made clear that he did not wish to testify and was only present pursuant to a warrant to compel him to testify.  During his testimony, he stated that he could not remember or was unfamiliar with nearly every question asked of him.  During his testimony, DeShawn asked to leave on several occasions; each time the judge required him to answer the questions asked of him.  On both direct and cross-examination, for purposes of impeachment, the attorneys read passages from DeShawn's interview with the police, each of which DeShawn disavowed.  The prosecutor also played a recording of DeShawn's interview with the police.  In that recording DeShawn identified Laylow (petitioner) as the shooter and a member of 69th Village (ECF No. 16-4 at 224–41).  He described seeing Laylow's face as the car passed and explained that he was familiar with Laylow because he had seen him many times in the area (*id*. at 226, 231–32).  DeShawn also stated that "Rome" (Jerome Williams) told him he had seen Laylow before the shooting (*id*. at 228).

Petitioner contends that his right to confrontation was violated by DeShawn's failure to answer defense counsel's questions on cross-examination.  The California Court of Appeal found that DeShawn responded substantively to a number of defense counsel's questions, including admitting that he was near the scene of the shooting, that he heard gunshots, did not see the shooter or the vehicle, and admitting the he was angry that his friends had been hurt (ECF No. 18-4 at 20).  He testified that he did not remember being arrested after the shooting or offering the police information in exchange for being released (*ibid*).  Based on his testimony, the appellate court concluded: "the jury was given an opportunity to observe his demeanor and judge his credibility" (*ibid*).  The appellate court, citing to *Chapman v. California*, 386 U.S. 18 (1967), also held that any failure to strike DeShawn's testimony was "harmless beyond a reasonable doubt given the other evidence that established Denard's guilt" (*ibid*).

The Confrontation Clause of the Sixth Amendment provides that in all criminal cases, the accused has the right to "be confronted with the witnesses against him."  "[T]he main and essential

19

purpose of confrontation is *to secure for the opponent the opportunity of cross-examination*.'"

*Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986) (internal citations and quotation marks

omitted) (emphasis in original).  Significantly, "the Confrontation Clause guarantees an

opportunity for effective cross-examination, not cross-examination that is effective in whatever

way, and to whatever extent, the defense might wish."  *Id.* at 679 (quoting *Delaware v. Fensterer*,

474 U.S. 15, 20 (1985)) (emphasis excluded).

> The Confrontation Clause includes no guarantee that every witness
> called by the prosecution will refrain from giving testimony that is
> marred by forgetfulness, confusion, or evasion.  To the contrary, the
> Confrontation Clause is generally satisfied when the defense is given
> a full and fair opportunity to probe and expose these infirmities
> through cross-examination, thereby calling to the attention of the
> factfinder the reasons for giving scant weight to the witness'
> testimony.

*Delaware*, 474 U.S. at 21–22.  The Confrontation Clause "commands[] not that evidence be

reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-

examination."  *Crawford v. Washington*, 541 U.S. 36, 61 (2004).  A Confrontation Clause claim is

subject to harmless error analysis.  *See Winzer v. Hall*, 494 F.3d 1192, 1201 (9th Cir. 2007) (citing

*Brecht*, 507 U.S. at 113).  "Under this standard, habeas petitioners . . . are not entitled to habeas

relief based on trial error unless they can establish that it resulted in 'actual prejudice.'"  *Brecht*,

507 U.S. at 637.

Petitioner fails to identify any clearly established Supreme Court law which is contrary to

the state court decision.  In short, petitioner argues that Deshawn's feigned memory loss and

disingenuous answers, prevented him from cross-examining the witness.  Petitioner relies solely

on *Douglas v. Alabama*, 380 U.S. 415 (1965), in support of his argument.  In *Douglas*, the

Supreme Court held that the admission of a prior statement by a witness who, at trial, invoked his

Fifth Amendment right against self-incrimination and refused to answer questions, violated the

defendant's "right of cross-examination secured by the Confrontation Clause."  *Id.* at 419.

Petitioner's reliance on *Douglas* is misplaced.  The Supreme Court overturned the

conviction in *Douglas* because the testimony at issue "constituted the only direct evidence" of the

defendant's culpability.  380 U.S. at 419.  Here, Deshawn's testimony was not the only direct

evidence of petitioner's guilt; Hudson identified petitioner as the shooter.  More importantly, in *Douglas*, the witness refused entirely to testify by invoking the Fifth Amendment.  In this case, DeShawn answered the questions asked of him on cross-examination.  *See Felix v. Mayle*, 379 F.3d 612, 618 (9th Cir. 2004), *rev'd and remanded on other grounds*, 545 U.S. 644 (2005) (holding that a witness who feigned memory loss when questioned about a prior statement was distinguishable from *Douglas* because in "*Douglas* . . . there was no way to cross-examine the witness who had invoked the Fifth Amendment on the subject.  In the present case . . .[defendant] was free to cross-examine the witness . . ."); *see also United States v. Romo-Chavez*, 681 F.3d 955, 961 (9th Cir. 2012) ("All the Confrontation Clause requires is the ability to cross-examine the witness about his faulty recollections.").  Because there is no Supreme Court case directly addressing facts analogous to this case, petitioner is not entitled to relief on this claim.

Finally, even assuming there was a Confrontation Clause violation, that violation did not have a "substantial and injurious effect or influence in determining the jury's verdict" under the facts of this case.  *Brecht*, 507 U.S. at 623.  Excluding DeShawn's testimony and the recording, there was still significant evidence implicating petitioner in the shooting.  This includes Hudson's identification of petitioner, the cell phone analysis, and petitioner's videos prior to trial, which the trial judge equated to a "signed video recorded confession" (*see* ECF No. 17-24 at 45).  For these reasons, petitioner has not sufficiently alleged a Sixth Amendment confrontation violation.  Consequently, the state court's denial of petitioner's claim was neither contrary to nor an unreasonable application of federal law.  Claim three is denied.

### 4.   RIGHT TO A PUBLIC TRIAL: CLAIM FOUR

In his next claim, petitioner argues that his right to a public trial was violated when the trial judge ordered all individuals on felony probation to leave the courtroom (Pet. 30).  He also contends that the judge improperly placed limits on when individuals could enter and exit the courtroom after proceedings had begun (*ibid*).

During trial, the judge stated: ". . . anyone here that is on felony probation, they should leave [the courtroom]" (ECF No. 17-16 at 79).  He then stated, "I am not going to tolerate any longer . . . a very disruptive pattern of behavior by people in the audience who have been getting

United States District Court
Northern District of California

up and leaving . . . if people wish to be present in this courtroom . . . you must be here when the session begins" (*ibid*).  The next morning, the judge withdrew his decision to exclude individuals on felony probation (ECF No. 17-17 at 5).

The California Court of Appeal laid out the relevant law:

> A criminal defendant has a constitutional right to a public trial, including the presence of friends or relatives.  (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 13; *In re Oliver* (1948) 333 U.S. 257, 271–272; *Waller v. Georgia* (1984) 467 U.S. 39, 44*; People v. Esquibe*l (2008) 166 Cal.App.4th 539, 551, 553.)  Violation of the right to a public trial is a reversible per se error.  (*People v. Woodward* (1992) 4 Cal.4th 376, 381.)  However, the temporary exclusion of select supporters of the accused does not necessarily violate the constitutional right to a public trial.  (*People v. Esquibel*, *supra*, at p. 552[.]

(ECF No. 18-4 at 32).  The appellate court then found the exclusion of felony probationers *de minimis*, explaining that the order was in effect during the partial testimony of only two witnesses — a police inspector whose testimony was negligible, and Lieutenant Jones who's testimony only covered the prosecutor's expert voir dire examination (*id.* at 33).  The court explained that the order was withdrawn before Lieutenant Jones testified as to his expert qualifications or provided any substantive testimony (*ibid*).

The Sixth Amendment directs, in relevant part, that "'[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial.'"  *Presley v. Georgia*, 558 U.S. 209, 212 (2010) (alteration in original).  The right to a public trial entitles a defendant "at the very least . . . to have his friends, relatives and counsel present, no matter with what offense he may be charged."  *In re Oliver*, 333 U.S. 257, 272 (1948).  "Nonetheless, in some circumstances, exclusion of members of the public from a judicial proceeding does not implicate the constitutional guarantee."  *United States v. Rivera*, 682 F.3d 1223, 1229 (9th Cir. 2012) (citation omitted).  "To determine whether a closure was too trivial to implicate the Sixth Amendment guarantee, we must determine whether the closure involved the values that the right to a public trial serves."  *United States v. Ivester*, 316 F.3d 955, 960 (9th Cir. 2003).  "Those values, as we have explained, include: ensuring fair proceedings; reminding the prosecutor and judge of their grave responsibilities; discouraging perjury; and encouraging witnesses to come forward."  *Rivera*, 682 F.3d at 1229

1    (citing *Ivester*, 316 F.3d at 960).

2          The state court decision denying this claim was not an unreasonable application of

3    Supreme Court case law.  The judge was well within his right to admonish spectators for

4    disrupting the trial and requiring that they be present when the sessions begin.  *See United States*

5    *v. Akers*, 542 F.2d 770, 772 (9th Cir. 1976) ("The right to a public trial does not preclude a limited

6    exclusion of spectators where necessary to avoid disorder.")  Nor were petitioner's Sixth

7    Amendment rights violated by the limited decision to exclude felony probationers.  The ruling was

8    of limited nature, lasting one afternoon, and covering only 10 pages of the police inspector's

9    transcript, and 33 pages of the Lieutenant Jones's transcript.  As the Ninth Circuit has explained,

10   there are some closures that are "too trivial to implicate the Sixth Amendment guarantee." *Ivester*,

11   316 F.3d at 960.  Such was the case here.  There is simply nothing in the record to suggest that the

12   exclusion of felony probationers had any effect on the values underlying the right to a public trial.

13   *See Rivera*, 682 F.3d at 1229.  Notably, shortly after the judge made his decision, the court

14   informed the defense that they should alert anyone who left that the order was being reevaluated

15   (ECF No. 17-16 at 125).  That order was withdrawn the next morning (ECF No. 17-17 at 5).

16   Petitioner is denied relief on claim four.

17          5. INEFFECTIVE ASSISTANCE OF COUNSEL: CLAIM FIVE

18          Petitioner initially raised six claims of ineffective assistance of counsel in his petition (Pet.

19   31–41).  Respondent contends that two of those claims are unexhausted (ECF No. 15-1 at 55–57).

20   Petitioner agrees and withdraws the two claims in his traverse (ECF No. 25 at 35).  Thus,

21   petitioner's claims of ineffective assistance of counsel are as follows:  (1) counsel's failure to

22   object to Hudson's identification of petitioner while in the hospital; (2) counsel's failure to object

23   to the prosecutor's closing argument; (3) counsel's failure to file a suppression motion with

24   respect to guns seized; and (4) counsel's failure to appropriately investigate favorable information.

25          The Sixth Amendment guarantees the accused the "right . . . to have the Assistance of

26   Counsel for his defense."  The right to counsel is the right to the effective assistance of counsel,

27   and counsel can deprive a defendant of the right by failing to render adequate legal assistance.

28   *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  To prevail on a Sixth Amendment

United States District Court
Northern District of California

23

ineffectiveness of counsel claim, petitioner must establish two things.  *First*, the defendant must establish "that counsel's representation fell below an objective standard of reasonableness." *Id*. at 687–88.  *Second*, the defendant must establish that he was prejudiced by counsel's deficient performance, *i.e.*, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.  On habeas review, it is not enough for a federal court to have found counsel ineffective.  The federal court must also find that the state court's resolution of the issue was unreasonable, a higher standard. *Harrington*, 562 U.S. at 101.

### a.   Failure to Object to Hudson's Identification of Petitioner

Petitioner argues that his counsel was ineffective in failing to object to the admission of the photo array in which Hudson — one of the adult victim's and a member of 65th Village — identified petitioner as the shooter (Pet. 31).  Petitioner explains that Hudson was in critical condition and on medication at the time he was shown the photo array, and that the admission violated various California rules of evidence (*ibid*).  He also states that when Hudson met with officers a month after the shooting, he expressed that he did not recall an officer showing him pictures at the hospital, nor did he recall identifying petitioner in the photo array (*id*. at 32).

The California Court of Appeal found, under California rules of evidence, that the photo array was admissible as proof of a prior inconsistent statement, as it was at odds with Hudson's trial testimony (ECF No. 18-4 at 18–19).  Thus, the appellate court found no attorney error.

Petitioner's underlying claim rests purely on matters of state law, of which the state court found no error.  Thus, because it was not improper for the photo array to be admitted into evidence, any objection by petitioner's trial counsel would have lacked merit.  Counsel's failure to raise a meritless objection does not support a finding of ineffective assistance of counsel. *See Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) ("[T]he failure to take a futile action can never be deficient performance."); *James v. Borg*, 24 F.3d 20, 26–27 (9th Cir. 1994) (counsel's failure to make what would be a futile motion does not qualify as ineffective assistance of counsel). Petitioner is denied relief on this claim.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

b.   Failure to Object to the Prosecutor's Closing Argument

Petitioner avers that trial counsel was ineffective in failing to object when the prosecutor lessened the burden proof in his closing argument (Pet. 33).  He states that the prosecutor "improperly conflated portions of the circumstantial evidence instruction and the presumption of innocence instruction in such a way as to lower [the] burden of proof" (*ibid*).  Petitioner points to three statements made by the prosecutor at closing:

> The Judge will instruct you that you have a duty to be reasonable, and if one interpretation of the evidence appears to be reasonable and the other interpretation appears to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable.  You must decide, when you listen to me, to the defense attorneys, what makes sense, what is reasonable, and what simply doesn't add up in your minds.
>
> . . .
>
> If the evidence points you -- you are to decide what the evidence shows here, but if the evidence points you to only one reasonable explanation, that's exactly what the law asks you to decide.  Reject the unreasonable and accept the reasonable.  That's exactly the black and white letter law that you will be given.  That's not shifting of any burdens.
>
> . . .
>
> Now, again, you come back to this.  This interpretation of the evidence.  And what I wanted to show, but this is -- it doesn't apply with just each piece of evidence.  In other words, you don't assess every piece of evidence, whether it is the cell phone records or the efforts to intimidate witnesses or the gang evidence, and you look at it by itself and determine, well, I have a reasonable explanation here and a reasonable explanation there.  I got to go with the one with innocence.  That's not the way it works.  The law says you take the whole case, look at the whole case as one interpretation, reasonable and the other unreasonable.  If so, you must accept the reasonable.

(ECF No. 17-22 at 8; ECF No. 17-23 at 42, 60).

The California Court of Appeal rejected the underlying claim of prosecutorial misconduct, finding that the prosecutor specifically stated that a determination of reasonableness is a starting point for jury deliberation, and later reminded the jury in no uncertain terms, that the burden of proof is beyond a reasonable doubt (ECF No. 18-4 at 36–37).  The court also noted that the judge articulated the correct legal standard (*id*. at 37).

Federal habeas courts reviewing a claim that counsel was ineffective for failing to object to

improper statements at closing must be deferential to both counsel's decision not to object and the state court's conclusion that that decision was reasonable.  *See Harrington*, 562 U.S. at 105. Moreover, failure of counsel to object during closing argument "generally does not constitute deficient performance", because "[a]bsent egregious misstatements, the failure to object during closing argument and opening statement is within the wide range of permissible professional legal conduct."  *Zapata v. Vasquez*, 788 F.3d 1106, 1115 (9th Cir. 2015) (citation and internal quotation marks omitted).  Notably, "arguments of counsel generally carry less weight with a jury than do instructions from the court."  *Boyde v. California*, 494 U.S. 370, 384 (1990).

The California Court of Appeal's rejection of petitioner's claim was not unreasonable.  The prosecutor's comments did not lessen the burden of proof.  Instead, the prosecutor encouraged the jurors to use their best judgment when evaluating the conflicting testimony and urged them to reject unreasonable interpretations of the evidence by the defense.  The prosecutor made clear at the end of his argument that the burden of proof is beyond a reasonable doubt: "[t]he burden of proof is beyond a reasonable doubt.  You all know that.  It has been stated several times.  It is no magic formula.  It is no far reaching standard that is impossible.  It is the same burden that is used in every criminal case . . ." (ECF No. 17-23 at 63).

Shortly before closing argument, the trial judge reminded the jury about the importance of following the law as instructed by the judge: "the attorneys will have the opportunity to summarize the law that applies in this case.  If there is any variance or any difference between what any attorney says the law is and what I tell you the law is in my closing instructions, you must follow the law as I state it to you" (ECF No. 17-22 at 5).  The jury is presumed to follow its instructions.  *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000).  In his final instruction, the judge instructed that the jury must apply the law as set forth in the jury instructions (ECF No. 17-23 at 67).  Shortly after, the judge explained the definition of circumstantial evidence (*id*. at 70), and defined, unequivocally, the burden of proof: "[t]his presumption places upon the People the burden of proving [the defendant] guilty beyond a reasonable doubt" (*id*. at 79).  Given the entirety of the prosecutor's closing argument, as well as the trial judge's specific instructions on the law, there is nothing to indicate that the jury was misinformed of the correct burden of proof.

1    Accordingly, habeas relief is denied on this claim.

2                    c.    Failure to Raise a Suppression Motion

3            Petitioner contends that his attorney failed to file a motion to suppress guns seized during

4    the execution of a search warrant.  He argues that there was no "nexus between Petitioner's

5    criminal activities and the place to be searched", and that the search lacked probable cause (Pet.

6    34–35).

7            The day after the shooting, the police obtained a warrant to search a residence on Pheasant

8    Drive, as well as two vehicles nearby (ECF No. 19-3 at 282–88).  The affidavit indicated that

9    another individual named Maxwell, was seen entering the Pheasant Drive apartment, while

10   petitioner remained in a vehicle (*id*. at 287).  The affidavit explained that individuals who commit

11   murder often conceal evidence in their place of residence or vehicles (*ibid*).  After the search was

12   conducted, the police located several guns and gang paraphernalia (ECF No. 17-11 at 63–69).  The

13   guns seized were not the murder weapon (ECF No. 17-12 at 104–06).

14           The California Court of Appeal laid out the standard under *Strickland* and held as follows:

15               [W]hen, as here, an ineffective assistance claim is predicated on
                 counsel's failure to bring a motion to suppress evidence on Fourth
16               Amendment grounds, the defendant " 'must also prove that his Fourth
                 Amendment claim is meritorious.' " (*People v. Wharton* (1991) 53
17               Cal.3d 522, 576, citing *Kimmelman v. Morrison* (1986) 477 U.S. 365,
                 375.)
18
                 It is highly doubtful that Denard's showing would have been
19               sufficient to overcome the good faith exception to the exclusionary
                 rule. "Evidence obtained by police officers acting in reasonable
20               reliance on a search warrant issued by a detached and neutral
                 magistrate is ordinarily not excluded under the Fourth Amendment,
21               even if a reviewing court ultimately determines the warrant is not
                 supported by probable cause. [Citation.] This is commonly referred to
22               as the good faith exception to the exclusionary rule. However, the
                 good faith exception to the exclusionary rule is inapplicable if 'the
23               affidavit was " 'so lacking in indicia of probable cause' " that it would
                 be " 'entirely unreasonable' " for an officer to believe such cause
24               existed.' [Citation.]

25               . . .

26               Moreover, even if the evidence might have been suppressed, Denard
                 has not established a reasonable probability that the outcome at trial
27               would have been different.  While the guns and gang paraphernalia
                 seized helped to establish his access to guns and his gang
28               membership, Denard's access to weapons and gang membership was

United States District Court
Northern District of California

1   well documented in his social media postings and the images and
    videos recovered from his phone.

2   (ECF No. 18-4 at 44–45).

3       The state court's rejection of this claim was not unreasonable.  In order to establish

4   ineffective assistance of counsel based on defense counsel's failure to litigate a Fourth

5   Amendment issue, petitioner must show that: (1) the overlooked motion to suppress would have

6   been meritorious, and (2) there is a reasonable probability that the jury would have reached a

7   different verdict absent the introduction of the unlawful evidence.  *Ortiz-Sandoval v. Clarke*, 323

8   F.3d 1165, 1170 (9th Cir. 2003) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986)).

9   Failure to file a meritorious suppression motion does not constitute *per se* ineffective assistance of

10  counsel.  *Kimmelman*, 477 U.S. at 384.

11      Here, even assuming the evidence of guns and gang paraphernalia could have been

12  suppressed, it is not reasonably probable that the jury would have reached a different verdict.  *See*

13  *Ortiz-Sandoval*, 323 F.3d at 1170.  Setting that evidence aside, petitioner's connection to the 69th

14  Village gang was well documented for the jury, as was his violent nature and access to guns.

15  Between the videos, tattoos, and social media posts, the jury was left with no doubt as to

16  petitioner's gang affiliation and violent intent.  There is no basis to grant federal habeas relief on

17  this claim.

18              d.   Failure to File Motion to Reveal DeShawn Rico's Criminal History

19      Petitioner argues that his counsel was ineffective in failing to file a motion to unearth

20  information relating to DeShawn Rico's criminal history (Pet. 41).  The California Court of

21  Appeal rejected this claim, finding an absence of prejudice:

22          The jury knew that DeShawn offered to provide information
            regarding the shooting after being arrested for possession of an assault
23          weapon shortly after the shooting.  DeShawn's association with the
            65th Village gang was well established at trial so that the jury was
24          aware of any potential motivation this may have provided to identify
            Denard as the shooter.  Denard's argument that the jury would have
25          reached a different verdict had it also known about his involvement
            in the prior shooting is purely speculative.
26
    (ECF No. 18-4 at 40–41).
27
        The state court's rejection of this claim was not an unreasonable application of *Strickland*.
28

United States District Court
Northern District of California

28

1   Under the prejudice prong of *Strickland*, a defendant must prove that but for counsel's error, the

2   result of the proceeding would have been different.  466 U.S. 694.  As previously noted in this

3   order, the jury was already aware of DeShawn's motivations to lie about petitioner's involvement

4   in the shooting.  To the extent the additional information relating to DeShawn's limited juvenile

5   history would have been useful in impeaching the witness, it was certainly insufficient to alter the

6   jury verdict.  Habeas relief is denied on this claim.

7         6.   CUMULATIVE ERROR: CLAIM SIX

8         Petitioner contends that the cumulative errors entitle him to relief.  Specifically, he points

9   to the appellate court's analysis which found a number of petitioner's claims to have constituted

10  harmless error:  the admission of Lieutenant Jones's gang expert testimony, the temporary

11  courtroom closure, the failure to turn over DeShawn's criminal record, and the failure to strike

12  DeShawn's testimony.  Both the California Supreme Court and the state appellate court summarily

13  rejected this claim.

14        In some cases, although no single trial error is sufficiently prejudicial to warrant reversal,

15  the cumulative effect of several errors may still prejudice a defendant so much that his conviction

16  must be overturned.  *See Alcala v. Woodford*, 334 F.3d 862, 893–95 (9th Cir. 2003) (reversing

17  conviction where multiple constitutional errors hindered defendant's efforts to challenge every

18  important element of proof offered by prosecution.)  Cumulative error is more likely to be found

19  prejudicial when the government's case is weak.  *See Thomas v. Hubbard*, 273 F.3d 1164, 1180

20  (9th Cir. 2002), *overruled on other grounds by Payton v. Woodford*, 299 F.3d 815, 829 n.11 (9th

21  Cir. 2002) (noting that the only substantial evidence implicating the defendant was the

22  uncorroborated testimony of a person who had both a motive and an opportunity to commit the

23  crime).  "We have granted habeas relief under the cumulative effects doctrine when there is a

24  'unique symmetry' of otherwise harmless errors, such that they amplify each other in relation to a

25  key contested issue in the case."  *Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011) (quoting

26  *Parle v. Runnels*, 505 F.3d 922, 933 (9th Cir. 2007)).  "If the evidence of guilt is otherwise

27  overwhelming, the errors are considered 'harmless' and the conviction will generally be affirmed."

28  *Parle*, 505 F.3d at 928 (citing *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996)).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Here, even if there were underlying errors, those errors do not amplify each other in this

2  case.  The brief closure of the courtroom bears no connection to the other assumed constitutional

3  errors, nor does it rise to the level of a constitutional violation.  Lieutenant Jones's testimony was

4  directed at proving petitioner was a member of the 69th Village gang, of which there was

5  substantial other evidence at trial.  Finally, DeShawn's juvenile record and his trial testimony

6  relate to his identification of petitioner as the shooter.  Given that one of the victim's identified

7  petitioner as the shooter, and DeShawn's testimony was of limited value to either side, petitioner

8  is not entitled to habeas relief under the cumulative error doctrine.

9  **CONCLUSION**

10    For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.

11    A certificate of appealability will not issue because reasonable jurists would not "find the

12  district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*,

13  529 U.S. 473, 484 (2000).  Petitioner may seek a certificate of appealability from the United States

14  Court of Appeals.

15    The clerk shall close the file.

16    **IT IS SO ORDERED.**

17  Dated:  March 9, 2021

18  WILLIAM ALSUP
    UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26

27

28